Enrico A. McCleary II, Esq. (*pro hac vice to be filed*)
The Law Office of Enrico A. McCleary II Esq. LLC
PO BOX 1256
Laurel, Maryland 20725
Phone: 240-334-6985
Fax: 240-334-6986

Andrew Rozynski, Esq. (*pro hac vice to be filed*)
arozynski@eandblaw.com
EISENBERG & BAUM, LLP
24 Union Square East, PH
New York, NY 10003
212-353-8700 (tel.)
212-353-1708 (fax)
*Attorneys for Plaintiff*

Jared Allebest, #325086
Allebest Law Group PLLC
212 East Crossroads Blvd #207
Saratoga Springs, Utah 84045
Cell: (949) 322-3991
Videophone: (801) 204-9055
Email: Jared@Allebest.com

***Attorneys for Plaintiffs,***
***The Estate of Robert Daniel Jeter and Christina Jeter***

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE ESTATE OF ROBERT D. JETER, C/O CHRISTINA JETER, as personal representative and individually,<br><br>Plaintiffs,<br><br>v.<br><br>THE UNITED STATES OF AMERICA, a Public Entity; and JOHN DOES 1 through 10, inclusive,<br><br>Defendants. | Case No: 5:25-cv-2802<br><br>**COMPLAINT FOR WRONGFUL DEATH, NEGLIGENCE, AND VIOLATIONS OF THE 8TH AMENDMENT**<br><br>[28 U.S.C. §2671, ET. SEQ.]<br><br>**JURY TRIAL DEMANDED** |

# **PRELIMINARY STATEMENT**

1.    Plaintiffs The Estate of Robert Daniel Jeter and Christina Jeter (as personal representative and individually) bring this action seeking compensatory damages against the United States pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §2671 et seq., for Wrongful Death and Negligence. Plaintiffs also seek compensatory and punitive damages against individual federal employees (Does 1-10) pursuant to *Bivens v. Six Unknown Named Agents* for violations of the Eighth Amendment arising from the preventable death of Robert Daniel Jeter while in federal custody.

# **JURISDICTION AND VENUE**

2.    **Subject Matter Jurisdiction:** This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction).

3.    **FTCA Jurisdiction:** This Court has subject-matter jurisdiction over Counts I through IV pursuant to the Federal Tort Claims Act (FTCA), 28 U.S.C. § 1346(b)(1), which waives sovereign immunity for tort claims against the United States for injury or loss of property caused by the negligent or wrongful act or omission of federal employees acting within the scope of their employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

4.    **Bivens Jurisdiction:** This Court has subject-matter jurisdiction over Count V pursuant to *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971), and *Carlson v. Green*, 446 U.S. 14 (1980), which provide a federal cause of action for violations of constitutional rights by federal officers acting under color of federal law.

5.    **Venue:** Venue is proper in the United States District Court for the Central District of California, Eastern Division (San Bernardino), under 28 U.S.C. §§ 1391(b) and 1402(b).

6.    **Location of Events:** The events and omissions giving rise to the claims occurred at United States Penitentiary Victorville (USP Victorville), located at 13777 Air Expressway Boulevard, Adelanto, California 92301, in San Bernardino County, which is within this District and Division.

## FTCA ADMINISTRATIVE EXHAUSTION

7.    **Administrative Claim Filed:** On January 18, 2024, Plaintiff Christina Teresa Jeter, individually and on behalf of the Estate of Robert Daniel Jeter, filed Standard Form 95 (Administrative Tort Claim) with the U.S. Bureau of Prisons, Regional Counsel, Western Region. The claim was assigned number TRT-WXR-2024-02513.

8.    **Claim Summary:** The administrative claim sought damages for the wrongful death of Robert Daniel Jeter resulting from the negligent acts and omissions

of Bureau of Prisons employees at USP Victorville on or about October 26-27, 2023, including failures to properly monitor Decedent while on suicide watch, failures to implement medical orders regarding medication access, and failures to provide timely emergency medical care.

9.     **Deemed Denial:** More than six (6) months have elapsed since the filing of the administrative claim without any final written disposition by the Bureau of Prisons or any other agency of the United States. Pursuant to 28 U.S.C. § 2675(a), the administrative claim is deemed finally denied as of **July 18, 2024**.

10.     **Timely Filing:** The administrative claim was timely filed within two years of the incident, and this Complaint is filed after the six-month statutory waiting period has elapsed. This action is therefore timely under 28 U.S.C. §§ 2401(b) and 2675(a).

11.     **Conditions Precedent Satisfied:** All conditions precedent to maintaining this action have been satisfied, including exhaustion of administrative remedies as required by 28 U.S.C. § 2675(a).

## **PARTIES**

12.     **Estate of Robert Daniel Jeter:** The Estate of Robert Daniel Jeter ("Mr. Jeter," "Decedent," or "the Estate") brings this action through Christina Teresa Jeter,

who is the duly appointed Personal Representative of Decedent's Estate pursuant to D.C. Superior Court, Probate Division, Case No. **2024 ADM 000152**.

13.    **Decedent's Status:** Robert Daniel Jeter was 29 years old at the time of his death on October 27, 2023. He was a federal inmate in the custody of the Bureau of Prisons, confined at USP Victorville in Adelanto, California.

14.    **Estate's Claims:** The Estate seeks survival damages for injuries, pain, and suffering that Mr. Jeter sustained prior to his death, as well as damages for violations of his constitutional rights, as permitted by California Code of Civil Procedure §§ 377.20-377.34 and federal law.

15.    **Christina Teresa Jeter - Individual Capacity:** Plaintiff Christina Teresa Jeter is the natural mother of Robert Daniel Jeter and is a resident of Washington, D.C.

16.    **Heir Status:** Ms. Jeter is Mr. Jeter's sole surviving parent and heir. Mr. Jeter was not married at the time of his death, left no children, and his father is unknown.

17.    **Wrongful Death Claims:** Ms. Jeter brings claims individually in her capacity as a statutory heir under California's wrongful death statute (California Code of Civil Procedure § 377.60) for the loss of her son's love, companionship, comfort,

care, assistance, protection, affection, society, and moral support, as well as for funeral and burial expenses.

18.     **Defendant United States of America:** Defendant United States of America is the proper defendant for claims brought under the Federal Tort Claims Act pursuant to 28 U.S.C. §§ 1346(b) and 2679(a).

19.     **Doe Defendants 1-10:** Defendants John Does 1 through 10 are BOP employees who were directly responsible for implementing mandated suicide watch procedures, complying with medical orders, or ensuring timely emergency response at USP Victorville in October 2023. These individuals are sued in their individual capacities for violations of Mr. Jeter's Eighth Amendment rights under *Bivens*.

## **FACTUAL ALLEGATIONS COMMON TO ALL COUNTS**

### **A. Robert Jeter's Background and Imprisonment**

20.     Robert Daniel Jeter was 29 years old when he died on October 27, 2023. He was a federal prisoner in the custody of the Bureau of Prisons (BOP), confined at the United States Penitentiary in Victorville, California (USP Victorville).

21.     Mr. Jeter's custody began in 2017 when he was approximately 23 years old. He had a prior history documented in BOP records that included treatment for Bipolar Disorder, Major Depression, Post-Traumatic Stress Disorder (PTSD), and opioid addiction.

22.    During his incarceration, BOP staff were aware of Mr. Jeter's extensive mental health history. His past included suicidal ideation, at least one known previous suicide attempt, and ongoing struggles with mental illness.

23.    Despite this knowledge, on October 25-27, 2023, BOP employees failed to follow mandatory suicide watch protocols and failed to implement critical safety measures explicitly ordered by medical professionals. This failure resulted in Mr. Jeter's preventable death.

**B. Events of October 26, 2023: The Precipitating Crisis**

24.    On or about October 25, 2023, Mr. Jeter exhibited signs of acute psychological distress. According to BOP records, he became agitated, expressed despair, and made statements that alarmed staff and led to concern about his safety.

25.    In response to this behavior, BOP staff properly placed Mr. Jeter on Suicide Watch—a special status that triggers mandatory, heightened safeguards for an inmate at risk of self-harm. This placement acknowledged the substantial risk to Mr. Jeter's life.

**C. BOP's Own Suicide Watch Policy: Mandatory 15-Minute Checks**

26.    The Bureau of Prisons has promulgated Program Statement 5324.08, titled *Suicide Prevention Program* (hereinafter, "PS 5324.08" or "BOP suicide watch

policy"), which sets forth comprehensive procedures to prevent inmate suicides. This Program Statement is binding on all BOP facilities and employees.

27.    PS 5324.08 explicitly requires that an inmate placed on Suicide Watch must be "observed by staff at staggered intervals *not exceeding fifteen (15) minutes.*" (Emphasis added.) This is a mandatory, non-discretionary requirement.

28.    The policy further mandates that the observations be documented on BOP Form BP-A0926, *Suicide Watch Observation Record*, where staff must initial and record the date and time of each observation. These records must then be reviewed by a supervisor to confirm compliance.

29.    The purpose of these checks is straightforward: to ensure that an inmate in crisis is continuously monitored so that staff can immediately detect and respond to any attempt at self-harm or any change in medical or psychological condition.

30.    USP Victorville, as a BOP facility, is governed by this policy and all BOP staff at USP Victorville are required to comply with PS 5324.08.

**D. The Medical Order: Remove Keep-on-Person (KOP) Medications**

31.    When an inmate is placed on Suicide Watch, BOP medical personnel conduct an immediate evaluation to determine what measures are necessary to ensure the inmate's safety. Among the most critical actions is the removal of any items that could be used for self-harm, including medications.

32.    In Mr. Jeter's case, BOP medical staff identified a specific, serious risk: Mr. Jeter had been prescribed *"Keep-on-Person" (KOP)* medications, meaning he was allowed to hold and self-administer certain prescribed drugs without direct supervision.

33.    On or about October 25, 2023, a BOP medical professional (the exact identity to be determined through discovery) issued a direct, unequivocal **medical order** requiring that all KOP medications be **immediately removed** from Mr. Jeter's possession given his suicidal state. This order was documented in BOP's electronic health records (BEMR system).

34.    This medical order was mandatory and non-discretionary. It was a direct command from a licensed medical professional aimed at eliminating a known, substantial risk to Mr. Jeter's life—the risk that he would intentionally overdose on the medications to end his life.

35.    The rationale for this order was clear and documented: Mr. Jeter was on Suicide Watch due to acute suicidal ideation and leaving him with access to potentially lethal medications would defeat the entire purpose of the watch. The order was specifically intended to prevent the very outcome that tragically occurred.

36.    BOP custody staff (including those responsible for housing unit operations and cell assignments) were responsible for ensuring compliance with this

medical order. They were required to physically retrieve any KOP medications in Mr.

Jeter's possession and to ensure that he had no access to any medications except under

direct medical supervision.

**E. BOP's Systemic Failures in Suicide Prevention: The DOJ OIG Report**

37.    In May 2023—just five months before Mr. Jeter's death—the U.S.

Department of Justice Office of the Inspector General (DOJ OIG) published a scathing

audit report titled *Audit of the Federal Bureau of Prisons' Efforts to Prevent Inmate

Suicide*, Report No. 23-055.

38.    The OIG Report found that the BOP had failed to adequately implement

its own suicide prevention policies at numerous facilities. Specifically, the OIG found

that many facilities routinely failed to conduct the required 15-minute checks on

inmates placed on Suicide Watch, falsified observation logs, and failed to provide

adequate mental health follow-up care.

39.    The OIG Report further noted that the BOP lacked sufficient staffing and

oversight to ensure compliance with suicide watch procedures and that preventable

suicides continued to occur in BOP custody at an alarming rate.

40.    USP Victorville, as a high-security federal penitentiary, was among the

institutions affected by the systemic deficiencies identified in the OIG Report. The

same failures documented nationwide—inadequate staffing, falsified logs, and failure to conduct required observations—were present at USP Victorville in October 2023.

41.     BOP officials at all levels, from facility administrators to headquarters leadership, were on notice of these deficiencies. Despite this notice, corrective action was inadequate or nonexistent, and the pattern of neglect continued.

**F. The Critical Hours: Failure to Monitor and Failure to Comply with the Medical Order**

42.     After being placed on Suicide Watch on October 25, 2023, Mr. Jeter was housed in a designated suicide watch cell. He was supposed to be under constant protective observation according to BOP policy PS 5324.08, which requires checks at least every 15 minutes.

43.     Upon information and belief based on BOP records, including the Suicide Watch Observation Record (BP-A0926), staff at USP Victorville **failed to conduct the required 15-minute checks** as mandated by policy. Instead, Mr. Jeter was left unobserved for extended periods—up to several hours—during the critical overnight period of October 25-26, 2023.

44.     Additionally, and even more critically, BOP custody staff **failed to comply with the direct medical order** to remove Mr. Jeter's KOP medications. Despite being explicitly ordered to retrieve these medications, staff either did not

attempt to do so or made an inadequate effort and failed to ensure that the medications were actually removed from Mr. Jeter's possession.

45.    As a result, Mr. Jeter retained access to his prescribed medications—medications that, in the hands of a suicidal individual in crisis, became the instrument of his death.

46.    The combination of these failures; (1) the failure to observe Mr. Jeter at the mandated intervals, and (2) the failure to remove the medications as explicitly ordered—created a situation where Mr. Jeter was left alone, in crisis, with the means to harm himself, for hours on end.

**G. Discovery of Mr. Jeter in Medical Distress**

47.    In the early morning hours of October 26, 2023, BOP staff eventually found Mr. Jeter unresponsive in his cell. The exact time of discovery is to be confirmed through discovery, but it was several hours after the last documented observation.

48.    Upon information and belief, Mr. Jeter had ingested a substantial quantity of his KOP medications in a deliberate overdose attempt during the hours when he was left unobserved.

49.    When staff finally discovered him, he was unconscious, not breathing, and had no pulse or showed minimal vital signs. He was in full cardiac and respiratory arrest or near arrest.

## H. Delayed and Inadequate Emergency Response

50.    After discovering Mr. Jeter in a life-threatening condition, BOP staff initiated an emergency response. However, the response was inadequate and delayed in several critical respects: a. **Delay in initiating effective CPR:** The timing and quality of cardiopulmonary resuscitation (CPR) efforts are critical in cardiac arrest. Upon information and belief, there was a delay in starting effective chest compressions, and the initial attempts were either inadequate or improperly performed. b. **Failure to immediately summon Emergency Medical Services (EMS):** Facility policy and basic medical standards require that outside EMS be notified immediately when an inmate is found in cardiac arrest. Upon information and belief, the call to 911 or the local emergency dispatch was delayed by several minutes, reducing the chance of survival. c. **Chaotic and disorganized response:** The emergency response appears to have been poorly coordinated. Multiple staff members were present but did not follow a clear chain of command or established protocol for a medical emergency of this severity. d. **Inappropriate administration of Narcan (Naloxone):** Upon information and belief, BOP staff administered Naloxone (Narcan), a medication used to reverse opioid overdoses. While Mr. Jeter did have a history of opioid use, there is no indication in the records that Narcan was medically indicated in this instance (as his prescribed medications were not opioids requiring Narcan), or that it was administered correctly or at the right time. The administration of Narcan may have

diverted attention from more critical life-saving measures such as high-quality CPR and prompt defibrillation. e. **Delay in transporting to an advanced medical facility:** Even after EMS arrived, there were further delays in stabilizing and transporting Mr. Jeter to a hospital capable of providing advanced life support.

51.    The delays and deficiencies in the emergency response compounded the initial failures to monitor Mr. Jeter and to remove his medications. By the time effective medical care was provided, Mr. Jeter had suffered severe and irreversible brain damage due to prolonged oxygen deprivation (anoxic brain injury).

**I. Transfer to Hospital and Death**

52.    Mr. Jeter was eventually transported by ambulance from USP Victorville to an outside hospital (the specific facility to be confirmed through discovery).

53.    Upon arrival at the hospital, medical personnel found that Mr. Jeter had suffered profound anoxic brain injury.

54.    Mr. Jeter was then transported to Arrowhead Regional Medical Center.

55.    Despite aggressive medical intervention, his brain function did not recover.

56.    After consulting with medical professionals and reviewing Mr. Jeter's prognosis, his mother, Christina Jeter, was faced with the devastating decision to withdraw life-sustaining treatment.

57.    Robert Daniel Jeter was pronounced dead on October 27, 2023. The cause of death was anoxic brain injury resulting from drug overdose and cardiac arrest, all occurring while Mr. Jeter was under the exclusive care and custody of the United States Bureau of Prisons.

**J. Preventability of Mr. Jeter's Death**

58.    Mr. Jeter's death was entirely preventable. Had BOP staff complied with just one of the two mandatory safeguards—either the 15-minute observation checks or the removal of KOP medications—Mr. Jeter would likely be alive today.

59.    If staff had conducted the required checks every 15 minutes, they would have discovered Mr. Jeter's overdose attempt within minutes of it occurring, allowing for immediate intervention that could have saved his life.

60.    If staff had complied with the explicit medical order and removed Mr. Jeter's medications, he would not have had the means to overdose, and the entire tragic chain of events would have been averted.

61.    The BOP's failures in this case were not isolated mistakes. They were part of a documented pattern of systemic neglect, inadequate staffing, and deliberate indifference to inmate safety that the DOJ OIG had warned about just months before Mr. Jeter's death.

**K. Christina Jeter's Relationship with Her Son and Damages**

62.    Christina Teresa Jeter is the natural mother of Robert Daniel Jeter. She raised him from birth and maintained a close and loving relationship with him throughout his life.

63.    Despite the challenges posed by Mr. Jeter's incarceration, Ms. Jeter remained a constant source of support, love, and encouragement for her son. She communicated with him regularly, visited when possible, and advocated for his welfare within the BOP system.

64.    Mr. Jeter was Ms. Jeter's only son. His death has left her devastated and bereft. She has suffered and continues to suffer profound grief, emotional pain, and loss of companionship.

65.    Ms. Jeter has incurred funeral and burial expenses for her son. She has also suffered economic losses due to the loss of the support and assistance that Mr. Jeter would have provided to her after his eventual release from custody.

66.    In addition to the tangible economic losses, Ms. Jeter has suffered intangible losses that are beyond monetary calculation: the loss of her son's love, affection, companionship, comfort, and society; the loss of his guidance and moral support; and the permanent void left by his untimely and preventable death.

## **COUNT I: WRONGFUL DEATH – NEGLIGENCE**

### **(Against the United States)**

67.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

68.    **Choice of Law:** Under the FTCA, liability is determined by the law of the state where the act or omission occurred. Here, the relevant acts and omissions occurred in California, and California law governs this claim.

69.    **Duty of Care:** Under California law, the United States, through its BOP employees at USP Victorville, owed a duty of care to Mr. Jeter to provide a reasonably safe environment and to protect him from foreseeable harm, including self-harm.

70.    **Special Duty in Custody:** The duty was heightened by the custodial relationship. Mr. Jeter was a prisoner wholly dependent on BOP for his safety, medical care, and basic needs. BOP had a special duty to protect him from known risks, including the risk of suicide.

71.    **Foreseeability:** It was eminently foreseeable that an inmate with a documented history of mental illness, prior suicidal ideation, and a recent acute crisis warranting placement on Suicide Watch would attempt to harm himself if left unmonitored and with access to potentially lethal medications.

72.    **Breach of Duty:** The United States, through its BOP employees, breached this duty of care in multiple respects: a. Failing to conduct the required observations of Mr. Jeter at intervals not exceeding 15 minutes as mandated by BOP

policy; b. Failing to comply with the explicit medical order to remove Mr. Jeter's KOP medications; c. Failing to provide adequate supervision and monitoring of a known suicidal inmate; d. Failing to implement and enforce BOP's own mandatory suicide prevention protocols; e. Failing to ensure that staff responsible for suicide watch were adequately trained, supervised, and held accountable; f. Failing to respond promptly and effectively when Mr. Jeter was discovered in medical distress; and g. Failing to provide timely and adequate emergency medical care, including effective CPR and immediate summoning of EMS.

73.    **Causation:** The breaches of duty described above were the direct, proximate, and substantial causes of Mr. Jeter's death. But for the failures to monitor Mr. Jeter and to remove his medications, he would not have been able to overdose undetected, and he would have survived.

74.    **Damages to Christina Jeter:** As a result of the United States' negligence, Plaintiff Christina Jeter, as the mother and sole heir of Mr. Jeter, has suffered damages including a. Loss of love, companionship, comfort, care, assistance, protection, affection, society, and moral support of her son; b. Funeral and burial expenses; c. Emotional distress, grief, and mental anguish; and d. Other economic and non-economic damages to be proven at trial.

**WHEREFORE,** Plaintiff Christina Teresa Jeter respectfully requests that this Court enter judgment in favor of Plaintiff and against Defendant United States of

America on Count I, and award compensatory damages in an amount to be proven at trial, together with costs, interest, and such other relief as the Court deems just and proper.

## COUNT II: WRONGFUL DEATH – MEDICAL NEGLIGENCE

## (Against the United States)

75.     Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

76.     **Medical Duty of Care:** Under California law, when a custodial institution provides medical care to an inmate, it assumes a professional duty to provide care consistent with the applicable standard of care in the medical community.

77.     **Applicable Standard:** The standard of care for an inmate on Suicide Watch with a known mental health crisis includes: a. Prompt psychiatric and medical evaluation; b. Removal of all means of self-harm, including medications that could be used to overdose; c. Continuous or near-continuous observation; d. Appropriate medication management under direct supervision; e. Immediate emergency medical response if the inmate is found in distress; and f. Proper documentation and communication among staff regarding the inmate's condition and care plan.

78.     **Breach of Medical Standard of Care:** BOP medical and custody staff breached the applicable standard of care by: a. Failing to ensure that the medical order to remove KOP medications was carried out; b. Failing to provide adequate

observation and monitoring despite the known risk of suicide; c. Failing to coordinate care between medical and custody staff; d. Failing to provide timely and adequate emergency medical intervention when Mr. Jeter was found unresponsive; and e. Failing to properly assess and manage Mr. Jeter's suicide risk given his documented psychiatric history.

79.    **Causation:** The medical negligence of BOP staff was a direct, proximate, and substantial cause of Mr. Jeter's death. Had the standard of care been met—particularly the removal of medications and proper monitoring—Mr. Jeter's overdose would have been prevented or promptly detected and treated.

80.    **Damages:** As a result of the medical negligence, Plaintiff Christina Jeter has suffered the damages described in Count I.

**WHEREFORE,** Plaintiff Christina Teresa Jeter respectfully requests that this Court enter judgment in favor of Plaintiff and against Defendant United States of America on Count II, and award compensatory damages in an amount to be proven at trial, together with costs, interest, and such other relief as the Court deems just and proper.

## COUNT III: SURVIVAL ACTION – NEGLIGENCE

### (Against the United States)

81.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

82.    **Survival Claim:** Under California Code of Civil Procedure § 377.30, a cause of action that survives the death of the person entitled to commence it may be asserted by the decedent's personal representative. This survival action is brought on behalf of the Estate of Robert Daniel Jeter for injuries and damages that Mr. Jeter himself suffered prior to his death.

83.    **Duty and Breach:** The United States owed Mr. Jeter a duty of care as described in Count I and breached that duty in the same manner.

84.    **Injuries and Suffering:** As a proximate result of the United States' negligence, Mr. Jeter suffered: a. Conscious pain and suffering as he experienced the overdose and loss of consciousness; b. Fear, terror, and emotional distress as his medical condition deteriorated; c. Severe physical injuries, including anoxic brain damage resulting from prolonged oxygen deprivation; d. Loss of enjoyment of life during the period between the overdose and his death; and e. The wrongful deprivation of his life.

85.    **Damages to the Estate:** The Estate of Robert Daniel Jeter is entitled to recover damages for the pain, suffering, and injuries that Mr. Jeter sustained before his death, as well as economic losses such as loss of future earnings capacity (to the extent Mr. Jeter had any such capacity).

**WHEREFORE,** Plaintiff Estate of Robert Daniel Jeter respectfully requests

that this Court enter judgment in favor of the Estate and against Defendant United States of America on Count III, and award compensatory damages in an amount to be proven at trial, together with costs, interest, and such other relief as the Court deems just and proper.

## COUNT IV: SURVIVAL ACTION – MEDICAL NEGLIGENCE

### (Against the United States)

86.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

87.    **Survival Claim:** This survival action is brought on behalf of the Estate of Robert Daniel Jeter for injuries and damages resulting from medical negligence that Mr. Jeter himself suffered prior to his death.

88.    **Duty and Breach:** BOP medical and custody staff owed Mr. Jeter a duty to provide medical care consistent with the applicable standard of care and breached that duty in the manner described in Count II.

89.    **Injuries and Damages:** As a proximate result of the medical negligence, Mr. Jeter suffered the injuries and damages described in Count III.

**WHEREFORE,** Plaintiff Estate of Robert Daniel Jeter respectfully requests that this Court enter judgment in favor of the Estate and against Defendant United States of America on Count IV, and award compensatory damages in an amount to be

proven at trial, together with costs, interest, and such other relief as the Court deems just and proper.

## COUNT V: EIGHTH AMENDMENT VIOLATION

## DELIBERATE INDIFFERENCE (Against Doe Defendants 1-10)

90.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

91.    **Bivens Claim:** This Count is brought pursuant to *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971), and *Carlson v. Green*, 446 U.S. 14 (1980), against individual BOP employees in their individual capacities for violations of Mr. Jeter's rights under the Eighth Amendment to the United States Constitution.

92.    **Eighth Amendment Right:** The Eighth Amendment's prohibition on cruel and unusual punishment imposes a duty on prison officials to provide humane conditions of confinement. This includes the duty to protect prisoners from serious harm, including self-harm, and to provide adequate medical care for serious medical needs.

93.    **Serious Medical Need and Substantial Risk:** Mr. Jeter's suicidal crisis constituted a serious medical need. The risk that Mr. Jeter would harm himself was substantial, obvious, and known to Defendants. His placement on Suicide Watch was an acknowledgment of this substantial risk.

94. **Deliberate Indifference Standard:** To establish an Eighth Amendment violation, Plaintiffs must show that Defendants were deliberately indifferent to Mr. Jeter's serious medical need. Deliberate indifference requires both: a. **Subjective knowledge:** The official must know of and disregard a substantial risk of serious harm; and b. **Objective unreasonableness:** The official's response must be objectively unreasonable. Both elements are satisfied here.

**Identification and Deliberate Indifference of Individual Doe Defendants**

95. The following individual BOP employees (whose names will be determined through discovery) acted with deliberate indifference to Mr. Jeter's Eighth Amendment rights:

**Doe Defendants 1-3: Suicide Watch Observation Staff**

96. These Defendants were assigned to conduct the mandatory 15-minute observation checks of Mr. Jeter while he was on Suicide Watch during the night of October 26-27, 2023.

97. **Actual Knowledge:** These Defendants had actual, subjective knowledge of the substantial risk to Mr. Jeter's safety. They knew: a. That Mr. Jeter had been placed on Suicide Watch due to acute suicidal ideation; b. That BOP policy PS 5324.08 **mandated** checks every 15 minutes; and c. That the purpose of the checks was to detect and prevent self-harm.

98.     **Conscious Disregard:** Despite this knowledge, Defendants Does 1-3 consciously disregarded the risk by: a. Failing to conduct observations at the required 15-minute intervals; b. Leaving Mr. Jeter unobserved for extended periods (several hours); c. Upon information and belief, falsifying observation logs to create the appearance of compliance when in fact they did not conduct the checks; and d. Thereby allowing Mr. Jeter to overdose undetected for hours, leading to catastrophic brain injury and death.

99.     **Deliberate Indifference:** The failure to conduct the required checks was not mere negligence. It was a conscious choice to ignore a known, life-threatening risk in violation of a clear, mandatory policy designed to save lives. This conduct rises to the level of deliberate indifference.

**Doe Defendants 4-6: Staff Responsible for Medication Removal**

100.    These Defendants were the BOP custody staff responsible for ensuring that Mr. Jeter's KOP medications were removed from his possession in compliance with the medical order issued on October 26, 2023.

101.    **Actual Knowledge:** These Defendants had actual, subjective knowledge of the substantial risk. They knew or should have known: a. That Mr. Jeter was on Suicide Watch; b. That a medical professional had issued a direct, **mandatory** order to remove all KOP medications; c. That the purpose of the order was to prevent Mr.

Jeter from using the medications to harm himself; and d. That failure to remove the medications created an obvious and substantial risk of overdose.

102. **Conscious Disregard:** Despite this knowledge, Defendants Does 4-6 consciously disregarded the risk by: a. Failing to retrieve Mr. Jeter's KOP medications; b. Failing to verify that the medications had been removed; c. Failing to document or follow up on compliance with the medical order; and d. Thereby leaving Mr. Jeter with the means to fatally overdose.

103. **Deliberate Indifference:** The failure to execute a clear, life-saving medical order was not mere negligence or bureaucratic oversight. It was a knowing abandonment of a specific duty imposed to prevent the exact harm that occurred. This conduct constitutes deliberate indifference.

**Doe Defendants 7-9: Emergency Response Staff**

104. These Defendants were BOP staff who responded to the emergency after Mr. Jeter was found unresponsive on the morning of October 27, 2023.

105. **Actual Knowledge:** These Defendants had actual knowledge that Mr. Jeter was in a life-threatening medical crisis (cardiac and respiratory arrest).

106. **Conscious Disregard:** Upon information and belief, these Defendants consciously disregarded his serious medical needs by: a. Delaying the initiation of effective CPR; b. Failing to immediately summon EMS; c. Providing a chaotic,

disorganized, and inadequate response; d. Administering Narcan without a clear medical indication, potentially diverting attention from critical interventions; and e. Allowing further delays in transporting Mr. Jeter to advanced medical care.

107.    **Deliberate Indifference:** The delays and inadequacies in the emergency response, when faced with a known life-threatening crisis, amounted to more than mere negligence. The failure to promptly and effectively respond to cardiac arrest—a time-sensitive emergency where every second counts—reflects a conscious disregard for Mr. Jeter's life.

**Doe Defendant 10: Supervisory Official**

108.    This Defendant is a supervisory BOP official at USP Victorville (or at the regional or national level) who had actual knowledge of deficiencies in suicide watch procedures, staffing shortages, and/or the systemic failures documented in the May 2023 DOJ OIG report.

109.    **Actual Knowledge:** This Defendant knew or should have known: a. That USP Victorville staff were not consistently complying with suicide watch procedures; b. That the facility was understaffed or lacked adequate training for suicide prevention; c. That the DOJ OIG had identified serious, systemic failures in BOP suicide prevention nationwide; and d. That these failures created a substantial risk of preventable inmate deaths.

110. **Conscious Disregard:** Despite this knowledge, Defendant Doe 10 consciously disregarded the substantial risk to inmates by: a. Failing to enforce compliance with PS 5324.08; b. Failing to provide adequate training, staffing, or resources; c. Failing to implement corrective measures recommended by the DOJ OIG; and d. Maintaining a policy or practice of indifference that directly contributed to Mr. Jeter's death.

111. **Deliberate Indifference:** A supervisory official's failure to correct known, systemic deficiencies that pose a substantial risk of harm to inmates constitutes deliberate indifference under the Eighth Amendment.

**Causation**

112. The deliberate indifference of each Doe Defendant was a moving force and a direct and proximate cause and a substantial factor in Mr. Jeter's injuries and death. But for their conscious disregard of known risks and mandatory safety protocols, Mr. Jeter's medical crisis would have been prevented or detected in time for life-saving intervention.

**Damages**

113. **Constitutional Injury:** Mr. Jeter's Eighth Amendment rights were violated, causing him to suffer extreme injury (anoxic brain damage) and death. He effectively experienced cruel and unusual punishment by being left to endure a life-threatening crisis without adequate intervention.

114.  **Compensatory Damages:** The Estate of Robert Daniel Jeter is entitled to recover and seeks compensatory damages from Doe Defendants 1-10, jointly and severally, for the violation of Mr. Jeter's constitutional rights, including the pain and suffering Mr. Jeter experienced and the loss of his life.

115.  **Punitive Damages:** The conduct of the Doe Defendants was wanton, reckless, and in callous disregard of Mr. Jeter's rights and safety. Deliberately ignoring a known serious risk to a prisoner's life constitutes the sort of egregious misconduct for which punitive damages are available in *Bivens* actions. Accordingly, Plaintiffs seek an award of punitive damages against the individual Doe Defendants in an amount sufficient to punish them and deter similar constitutional violations in the future.

**Qualified Immunity**

116.  **No Qualified Immunity:** Defendants are not entitled to qualified immunity. Qualified immunity protects officials from liability only if their conduct did not violate a "clearly established" constitutional right. Here, Defendants violated rights that were clearly established.

117.  **Clearly Established Law:** At the time of these events (October 2023), the law was clearly established that prisoners have an Eighth Amendment right to be protected from self-harm and to receive adequate medical care for serious medical

needs, and that an official's conscious disregard of a substantial risk of harm is unconstitutional.

118. **The Right Was Clearly Established for These Defendants:** The right was not abstract; it was made explicit and "clearly established" for these specific Defendants through two direct, **mandatory, non-discretionary** directives: a. **BOP's Own Mandatory Policy:** BOP Program Statement 5324.08 is a **mandatory, non-discretionary** policy that explicitly commanded Defendants Does 1-3 to observe Mr. Jeter at intervals "not exceeding fifteen (15) minutes." This policy itself clearly established the required standard of conduct. b. **An Explicit Medical Order:** Defendants Does 4, 5, and 6 were given a direct, **mandatory, non-discretionary** medical order to remove Mr. Jeter's KOP medications. This was not a suggestion; it was a specific, life-saving command.

119. **No Reasonable Belief in Legality:** No reasonable BOP official could have believed that it was constitutionally permissible to: a. Leave a known suicidal inmate unobserved for hours in direct violation of a **mandatory 15-minute check policy**; or b. Ignore a direct, **mandatory medical order** directing the removal of medications from that same suicidal inmate. These were not good-faith errors in judgment; they were abandonments of known, mandatory, life-saving duties. The unlawfulness of their conduct was apparent.

# PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Christina Teresa Jeter (individually and as Personal Representative of the Estate of Robert Daniel Jeter) pray that this Court grant judgment in their favor and against the Defendants, and award the following relief:

A.    **Compensatory Damages:** A sum of money to compensate Plaintiff Christina Jeter for the wrongful death of Robert Jeter, including damages for loss of love, companionship, support, and funeral/burial expenses; and a sum to compensate the Estate of Robert Jeter for his pain and suffering prior to death and the violation of his rights, all against Defendant United States (Counts I-IV) and Defendants Does 1-10 (Count V), in an amount to be proven at trial.

B.    **Punitive Damages:** An award of punitive and exemplary damages against the individual **Doe Defendants 1-10** only, in an amount sufficient to punish their deliberate indifference and to deter such conduct, as sought in Count V.

C.    **Costs and Attorneys' Fees:** An award of Plaintiffs' reasonable costs and attorneys' fees incurred in this action, to the extent allowed by law.

D.    **Interest:** Pre-judgment and post-judgment interest on awards as provided by law.

E.    **Other Relief:** Any and all further relief that this Court deems just and proper.

# DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by

1  jury on all issues so triable.                                    October 23, 2025

2                          Respectfully submitted,

3
                           */s:/ Jared Allebest*
4                          Jared Allebest, #325086
                           Allebest Law Group PLLC
5                          212 East Crossroads Blvd #207
                           Saratoga Springs, Utah 84045
6                          Cell: (949) 322-3991
                           Videophone: (801) 204-9055
7                          Email: Jared@Allebest.com

8                          LAW OFFICES OF ENRICO A. MCCLEARY II ESQ. LLC

9                          Enrico A. McCleary II, Esq.
                           (*pro hac vice to be filed*)
10                         PO BOX 1256
11                         Laurel, Maryland 20725
                           Phone: 240-334-6985
12                         Fax: 240-334-6986

13
                           EISENBERG & BAUM, LLP
14
                           Andrew Rozynski, Esq.
15                         (*pro hac vice to be filed*)
16                         24 Union Square East, PH
                           New York, NY 10003,
17                         (212) 353-8700
18                         arozynski@eandblaw.com

19

20

21

22

23

24

25

26

27

28

---